CITIZENS' BANK & TRUST CO. v. THORNTON et al.

(Circuit Court of Appeals, Fifth Circuit. December 7, 1909.)

No. 1,872.

1. BILLS AND NOTES (§ 340*)—REDISCOUNT OF NOTES—LIABILITY ON INDORSEMENT.

A bank accustomed to rediscount paper for a correspondent bank, which in the usual course received from its president for rediscount a negotiable note of third parties payable to such president, and indorsed by him and also by the bank, has a right to rely on such indorsements, unless there were extrinsic circumstances which charged it with notice of some irregularity.

[Ed. Note.—For other cases, see Bills and Notes, Cent. Dig. §§ 826, 845; Dec. Dig. § 340.*]

2. BANKS AND BANKING (§ 113*)—REPRESENTATION BY OFFICERS—ESTOPPEL TO DENY AUTHORITY OF OFFICER.

A bank which has intrusted the conduct of its affairs to its president, such conduct being within the range of the authority customarily given to such an officer, is bound to one who has parted with his money in good faith in reliance upon the authority so exercised, whatever may be the limitations which the by-laws or resolutions of the board of directors in fact place upon it, of which he has no knowledge.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 273–276; Dec. Dig. § 113.*]

3. BILLS AND NOTES (§ 340*) — REPRESENTATION BY OFFICERS — ESTOPPEL TO DENY AUTHORITY OF OFFICER.

Defendant national bank succeeded a state bank and assumed its obligations. Both banks were correspondents of complainant bank, which from time to time discounted notes for them, and rediscounted customers' notes, the business being conducted for them by the cashier of the state bank who became president of defendant. A short time before the change, at his request, complainant rediscounted a note of third persons payable to him and indorsed by him and the state bank, placing the proceeds to the credit of such bank in the account, which was later transferred to defendant at its request; its president stating that it succeeded to the assets and assumed the liabilities of the state bank. On maturity of the note, complainant sent it to defendant for collection, but defendant forwarded a new note made by the same parties in renewal. This complainant returned for the indorsement of defendant, and it was so

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Indorsed by its president, who stated that the failure to indorse it at first was an oversight, and it was thereupon accepted by complainant. *Held*, that complainant became a bona fide holder for value, and that defendant could not on the facts avoid liability as indorser on the ground of want of consideration.

[Ed. Note.—For other cases, see Bills and Notes, Cent Dig. §§ 826, 845; Dec. Dig. § 340.*]

**4. PLEDGES (§ 18*)—CONSTRUCTION OF CONTRACT.**

Pledges are to be construed and enforced according to the intent of the parties as gathered from the instrument of pledge and the subject-matter and course of dealing to which it relates.

[Ed. Note.—For other cases, see Pledges, Cent. Dig. § 41; Dec. Dig. § 18.*]

**5. PLEDGES (§ 19*)—DEBTS OR LIABILITIES SECURED—CONSTRUCTION OF CONTRACT.**

Defendant bank was a correspondent of complainant bank, which frequently lent defendant money and rediscounted notes for it. On the occasion of a $10,000 loan, defendant pledged with it collateral "to secure the payment of this or any other obligation * * * upon which the owner shall be in any way bound primarily or secondarily * * * due or to become due." *Held* that, construing the contract in the light of the relations and dealings between the parties, the pledge extended to a note subsequently received by complainant from defendant in renewal of one which it had previously rediscounted for defendant, and which was indorsed by the latter.

[Ed. Note.—For other cases, see Pledges, Cent. Dig. § 61; Dec. Dig. § 19.*]

**6. BANKS AND BANKING (§ 287*)—NATIONAL BANKS—EFFECT OF INSOLVENCY—LIQUIDATION BY RECEIVERS.**

A provision of a promissory note that, if not paid at maturity, the makers and indorsers shall be liable for all costs of collecting or attempting to collect the same, including an attorney's fee, cannot be enforced beyond the allowance of statutory costs against the receiver of an insolvent national bank who took charge of its assets for the purpose of liquidation before the note matured.

[Ed. Note.—For other cases, see Banks and Banking, Dec. Dig. § 287.*]

Appeal from the Circuit Court of the United States for the Eastern Division of the Northern District of Alabama.

Suit in equity by the Citizens' Bank & Trust Company against T. M. Thornton, receiver of the First National Bank of Attalla, and others. Decree for defendants, and complainant appeals. Reversed.

The appellant, the Citizens' Bank & Trust Company, a banking corporation under the laws of Tennessee, filed its bill in the circuit court against the First National Bank of Attalla, and Thomas M. Thornton, as receiver, appointed by the Comptroller of the Currency to liquidate its affairs. The original bill sought a decree against the bank and the receiver for $21,000 upon two promissory notes of the First National Bank for borrowed money, and a note for $5,000, hereafter referred to as the Buckmaster and Williams note, which appellant bank had discounted for defendant bank, and also to subject certain collateral for the debts, attorney's fees, etc.

The defendants' answers admit that the First National Bank of Attalla received the Buckmaster and Williams note for collection some time in April, 1906, but averred that the defendants never collected said note, or received any benefit therefrom, but that L. M. Dyke secured a renewal of the note and sent it to the appellant; that appellant returned it with the request that it be indorsed by the First National Bank of Attalla; that it was so indorsed by said L. M. Dyke, but that the said indorsement was a mere accommoda-

tion indorsement, and was made by Dyke without authority; and that the same was ultra vires so far as the bank was concerned, and created no liability. The answer further denied that the First National Bank of Attalla ever discounted said note with appellant, or received any benefit from its indorsement, and averred on information that the note was the individual debt of L. M. Dyke; and that the transaction with reference thereto was entirely for his benefit. The bill was twice amended in particulars not now material, since all the claims were paid, except the Buckmaster and Williams note, and by stipulation entered into in the court below, the controversy is resolved into an issue of the liability of the defendant bank upon the note, and the right to apply in satisfaction thereof certain collateral deposited with the appellant, under a written agreement, the nature and terms of which are hereafter stated.

The appellant did a banking business at Chattanooga, Tenn., and was the correspondent of the Bank of Attalla, a state banking institution at Attalla, Ala., from some time in October, 1904, until October 19, 1905, when that bank ceased to do business, and was succeeded by the First National Bank of Attalla, which took over the business of the Bank of Attalla, and appellant continued as the correspondent of the First National Bank of Attalla until it was closed by order of the Comptroller of the Currency, and Thornton placed in charge as receiver on May 15, 1906.

As the rights of the parties concerning the Buckmaster and Williams note turn upon the dealings between the Bank of Attalla and the First National Bank of Attalla and their transactions with the appellant as their correspondent, it will conduce to a better understanding of the case to give the correspondence between them, premising that L. M. Dyke was cashier of the Bank of Attalla until it ceased to do business, and afterwards became president of the First National Bank of Attalla upon its organization October 19, 1905, and acted as such until that bank was placed in the hands of a receiver May 15, 1906. The proof also shows that the original Buckmaster and Williams note, in renewal or payment of which the Buckmaster and Williams note in suit was given, was indorsed by the Bank of Attalla, and not by the First National Bank of Attalla, and that the inaccurate statement in that respect in the correspondence was due to confounding the two transactions.

On September 19, 1905, Dyke, as cashier of the Bank of Attalla, wrote appellant as follows:

"Attalla, Ala., Sept. 19, 1905.

"Mr. Herbert Bushnell, Cashier, Citizens' Bank & Trust Co., Chattanooga, Tenn.—Dear Sir: I herewith inclose note of $5,000.00, due October 20th, 1905, for discount and credit. You may charge our account note of $5,000.00 due 20th instant, and send to us cancelled. I also inclose note of $5,000.00 due October 19th, 1905, which we will thank you to discount and place to our credit, as cotton is beginning to move and we will need a little help for the next two or three weeks. We can send you collateral if you prefer it. If it is not asking too much, we would appreciate your sending us the collateral you now hold as security to our notes for collection, subject to the note you hold against us. We hope to be able to increase our balances with your good bank in a short time, and also take up our rediscounts in full. We expect to change this bank in a short time to a national bank, which I think will increase our deposits, as we will have two or three good men interested in the new organization, that we could not secure otherwise. Our deposits (are) now about $65,000, or about $20,000 more than this time last year.

"Very truly yours, L. M. Dyke, Cashier."

On October 3, 1905, Dyke, as cashier of the Bank of Attalla, wrote appellant as follows:

"Attalla, Ala., Oct. 3rd, 1905.

"Mr. H. Bushnell, Cashier, The Citizens' Bank & Trust Co., Chattanooga, Tenn.—Dear Sir: I herewith inclose our note for $5,000 due on the 15th instant, which we will thank you to discount and place to our credit. We are carrying $20,000 on cotton and as the market went off during the last few days our customers do not want to sell just as (at) this time. We also have notes maturing the next thirty days which will amount to about $40,000.00,

and it seems to us we ought to be able to collect at least half of the amount on or before maturity. We may also ask for an extension on part of our paper for something like thirty days, but will be able to take it all up by that time. Thanking you for your kindness, I am,

"Very truly yours,                              L. M. Dyke, Cashier."

On October 18, 1905, the day before the First National Bank of Attalla commenced to do business, Dyke, as cashier of the Bank of Attalla, wrote appellant as follows:

"Attalla, Ala., Oct. 18th, 1905.

"Mr. H. Bushnell, Chattanooga, Tenn.—Dear Sir: I herewith inclose note of Buckmaster and Williams, for $5,000, for discount and credit. You will notice this note is made payable to me and endorsed by me and also by the Bank of Attalla, which seems to me will make it perfectly safe. The new organization will assume any liability that the Bank of Attalla may have outstanding at the time the change takes place. This paper is further secured by mortgage made payable to me and other personal security. Although these parties have no rating in either Bradstreet or Dun's they are responsible for their contracts. They now have a balance with us of $3,000.00, but will need it in their new job down in La., where they have a contract that I think they will clear at least $10,000 on in five months. I think we will be able to meet our obligations as they fall due, although we are pretty heavily loaded on cotton just now. We only have one cotton buyer now that we are furnishing money to, and therefore we are not ordering any as heretofore, but we think we will have to ship some out in a few days. I suppose it will be agreeable with you for me to place the same amount of the new bank stock as collateral to my note as you now hold of the Bank of Attalla.

"Very truly yours,                              L. M. Dyke, Cashier."

The proof shows that the note inclosed in that letter was received for discount by the Citizens' Bank & Trust Company, and the proceeds amounting to $4,850 credited to the Bank of Attalla, on October 19, 1905. On October 20, 1905, a note of the Bank of Attalla to the appellant for $5,000 matured, and by instructions of Dyke appellant charged that note to the Bank of Attalla on that day. The books of appellant show there was a general credit balance upon its books in favor of the Bank of Attalla of $6,840.31 at that date, in which was included the item of $4,850, the proceeds of the discount of the Buckmaster and Williams note. On October 19, 1905, Dyke as cashier of the Bank of Attalla wrote appellant as follows:

"Attalla, Ala., Oct. 19, 1905.

"Mr. H. Bushnell, Cashier, Chattanooga, Tenn.—Dear Sir: If we should have checks to come in that would overdraw our account, please protect them and we will appreciate it very much. We have a cotton draft tomorrow for $4,000.00 or $5,000.00 which will be forwarded to you on to-morrow's mail. You can charge our note of $5,000.00 maturing on the 20th instant and return to us cancelled. We are converting or changing the Bank of Attalla to The First National Bank of Attalla, to-day, and you may charge the account accordingly. as what checks we shall give on your bank hereafter will be issued from the national bank.

"Yours truly,                                   L. M. Dyke, Cashier.

"Signatures for the First National Bank of Attalla for the transaction of the business, will be myself as President and W. R. Lawley, Cashier."

The books of appellant at the close of business October 3, 1905, show there was a credit balance in favor of the Bank of Attalla of $4,560.92. On November 1, 1905, appellant opened a new account with the First National Bank of Attalla, and the credit balance of $4,560.92 in favor of the Bank of Attalla was included in the new account, and credited to the First National Bank of Attalla. It was shown by the testimony of Henson, president of appellant, that it was customary to render the Bank of Attalla and its successor, the First National Bank of Attalla, a detailed statement of the credits and debits against the account during the month: such statement showing the credits and debits and opening balance at the beginning of the month and the closing

balance. Such statement was sent to the Bank of Attalla at the close of October, 1905, or a day or two later. This statement was a transcript of the face of the ledger for the month covered therein, and inclosed in a letter as follows:

"Bank of Attalla, Ala.

"Citizens' Bank & Trust Company, Chattanooga, Tennessee—Sir: Your statement for our account current for the month of October, showing a balance due you of $4,560.92 has been found correct, with exceptions noted below. Please examine promptly, sign and return this sheet, noting exceptions thereon."

This verification sheet was returned to complainant bank on the 3d of November, 1905, signed First National Bank of Attalla, by W. R. Lawley, Cashier, having the words, "with exceptions noted below," erased, so that Lawley's acknowledgment read: "Your statement for our account current for the month of October, showing a balance due you of $4,560.92 has been found correct."

On the 28th of February, 1906, the Bank of Attalla borrowed of appellant the sum of $10,000, evidenced by note as follows:

"$10,000.00 Chattanooga, Tenn., Feb. 28th, 1906.

"Sixty days after date we promise to pay to the order of Citizens' Bank & Trust Company, ten thousand and no/100 dollars, value received, negotiable and payable at Citizens' Bank & Trust Company, Chattanooga, Tennessee.

"To secure the payment of this or any other obligation to said bank, due or to become due, the undersigned hereby pledges to said bank, or its assigns, holders of the same, the collateral described on the back hereof, or hereunto attached, and it is hereby agreed that upon the non-payment of this obligation said bank or holder, may sell the same at public or private sale, for cash or on credit, as a whole or in parcels, at any place in the city of Chattanooga, without notice; and said bank, or holder, may at any such sale, purchase the same, or any part thereof, for its or his own account, and after deducting all costs of sale, the balance of the proceeds shall be applied to this obligation, and any surplus to any other note, obligation, bill, overdraft, or open account upon which the undersigned shall be in any way bound, primarily or secondarily, absolutely or contingently, due or to become due. Such application to be made in the manner and proportions as to said bank or holder may seem fit. Upon the discharge of this obligation said bank or holder may deliver the collateral to the undersigned or order, but shall have the right to retain the same to answer any other obligation, note, etc., as above described, just as if specially pledged under an agreement in the exact terms of this, and in no event shall said bank or holder be in any way responsible in dealing with said collateral to any person bound with the undersigned in any debt to said bank. It is also agreed that said collateral may from time to time, by mutual consent, be exchanged for others, which shall also be held by this bank, or assigns on the terms above set forth. The undersigned also hereby agrees to give said bank or its assigns, such additional collateral as its President, Vice-President or Cashier may at any time demand, and if said collateral shall not be promptly given when demanded, this note shall become immediately due and payable. It is agreed that said bank shall not be responsible in any way for nonpresentment, or for failing to protest any item in said collateral requiring presentment and protest. If this note or any collateral attached thereto, is collected by an attorney, by suit or otherwise, or if suit be brought upon either, we agree to pay all fees and cost of collection. It is agreed by the makers and indorsers hereof that demand, protest and notice of nonpayment of this paper are expressly waived.

"First National Bank of Attalla,
"By L. M. Dyke, President."

Indorsed on the back: "As collateral on the within note are pledged bills receivable amounting to $16,285.50."

The original Buckmaster and Williams note matured on April 15, 1906, and a few days before that was sent to the First National Bank of Attalla for collection. On April 14, 1906, Dyke wrote the cashier of appellant as follows:

"The First National Bank of Attalla,

"Capital $30,000.00 fully paid.

"Attalla, Ala., April 14, 1906.

"Mr. H. Bushnell, Cashier. Chattanooga, Tenn.—Dear Sir: Inclosed please find note of Buckmaster and Williams in renewal of one for same amount due on the 15th instant. Please make draft for amount of interest and charge to our account, and return draft to us to be charged to account of Buckmaster & Williams. These parties seem to be getting along fairly well, and will be able to reduce this loan considerably at maturity.

"The weather has done them considerable damage or has been so they could not put in full time and therefore asked me to carry the full amount for four months at which time they would reduce it. Trusting this will be satisfactory, I am,

"Very truly yours,                                    L. M. Dyke,"

To this letter appellant replied on April 16, 1906, as follows:

Citizens' Bank & Trust Co., Chattanooga, Tenn.    April 16, 1906.

"Mr. L. M. Dyke, President. Attalla, Ala.—Dear Sir: We are returning herewith note Buckmaster & Williams, $5,000.00, sent us in your favor of the 14th to renew their paper for like amount, which we discounted for your bank. As the old note bore the indorsement First National Bank, Attalla, we return this note for the purpose of having indorsement supplied on new note. Please have this done and return the paper to us at your early convenience. We are to-day charging your account two notes discounted, one, Curtis-Attalla Lumber, $1,000.00 due on the 16th; the other J. S. Brothers, $900.00, due on the 12th.

"Yours truly,                              H. Bushnell, Cashier.
"JH."

On April 17, 1906, Dyke replied as follows:

"The First National Bank of Attalla,

"Capital $30,000.00 fully paid.

"Attalla, Ala., April 17th, 1906.

"Mr. H. Bushnell, Cashier, Chattanooga, Tenn.—Dear Sir: Please find inclosed note indorsed as requested by you. This was an oversight by us.

"Very truly yours,                      L. M. Dyke, President."

On the day when the First National Bank of Attalla was placed in the hands of a receiver, the notes in suit not being charged in the account, the books of the Citizens' Bank & Trust Company showed a general credit balance in favor of the First National Bank of Attalla of $2,694.46. It was admitted that the collateral referred to on the back of the note of February 28, 1906, was after the insolvency of the First National Bank of Attalla turned over by the appellant to the receiver for collection, and that since the filing of the bill the $6,000 and $10,000 notes referred to have been paid by Thornton, receiver, in full, and that there remains on hand a sufficient sum arising from collections on collateral by said receiver to pay off the Buckmaster and Williams note.

Henson, president of the appellant, testified that at no time did Dyke have any individual account with his bank. Dyke, who was also examined, made no contradictory statements on that point. He testified that whatever statements were made in the letters as to the First National Bank of Attalla succeeding to the business and assuming the obligations of the Bank of Attalla were true, and that the accounts of the Bank of Attalla with its customers were transferred to the First National Bank of Attalla on its organization. He testified, also, that the proceeds of the discount of the first Buckmaster and Williams note went to the credit of the Bank of Attalla with the Citizens' Bank & Trust Company, but "that the First National Bank of Attalla never received any part of the proceeds of the Buckmaster and Williams note, and that the First National Bank of Attalla never assumed payment of the note, and that witness paid 'the interest on the renewal of the note himself, and charged it to his account with the First National Bank

of Attalla, and credited the Citizens' Bank & Trust Company with the amount. Section 27 of the by-laws of the First National Bank of Attalla provided that all contracts, checks, and drafts for this bank, and all receipts and circulating notes received from the Comptroller of the Currency, shall be signed by the president or cashier." On the 20th of January, 1906, the board of directors passed a resolution that "L. M. Dyke, president, be and he is hereby authorized to borrow or rediscount with the National Park Bank of New York, the whole, or any part of $20,000.00 and deposit with said bank as collateral security for the payment thereof notes or any other collateral which may be required by said National Park Bank, and execute all papers necessary for the safe assignment and transfer of said securities." There was nothing on the minutes showing any authorization to Dyke to indorse any paper for Buckmaster and Williams, or to rediscount its notes or to borrow money from appellant. A short time before the bank failed, the board of directors made an investigation of its affairs. It was discovered that there was a shortage in the notes which should have been on hand to the amount of about $40,000. Dyke, according to Brown, the vice president of the bank, explained by saying that he had sent these notes to New York for rediscounting, having kept no copy of the notes. He further testified that, as far as he knew, the attention of the board of directors had never been called to the fact that Dyke had ever discounted or rediscountd any notes of the First National Bank of Attalla with the Citizens' Bank & Trust Company. He further testified that "he could not be positive whether Dyke showed him a list of the notes he had sent off to be rediscounted, but said it seemed to him he looked over the list, but whether the notes sent to New York were included he was not sure." The list purported to be a list of the notes sent there or somewhere to be rediscounted, but there were $40,000 of note which should have been on hand, and the discrepancy was explained by Dyke as above stated.

The Circuit Court dismissed the bill on final hearing, having previously sustained a demurrer to so much of the bill as sought to apply the collateral securities which complainant had turned over to the receiver to the payment of the Buckmaster and Williams note, and these rulings are now assigned as error.

Knox, Acker & Blackmon and Pritchard & Sizer, for appellant.
Hood & Murphree, for appellees.

Before PARDEE, Circuit Judge, and JONES and FOSTER, District Judges.

JONES, District Judge (after stating the facts as above). The Buckmaster and Williams note reads as follows:

"$5,000.00    Attalla, Ala., April 14th, 1906.

"On the 12th of August, 1906, fixed, I, we, or either of us, promise to pay to L. M. Dyke, or order, five thousand & 00/100 dollars, value received, and with interest from maturity, negotiable and payable at the First National Bank of Attalla, Ala. Maker and indorser hereby agrees to pay any and all costs of collection, of whatever nature, either of collecting or attempting to collect, securing or attempting to secure, in part or in full, and also including a reasonable attorney's fee, if not paid at maturity. And all right to claim any exemption under the Constitution and laws of this or any other State is expressly waived by the maker and indorser of this note, and the maker and indorser also hereby waive notice of protest if not paid at maturity.

"Given under our hands and seals, this 14th day of April, 1906.

                        "Buckmaster & Williams.    [L. S.]
                        "E. Buckmaster.    [L. S.]"

Indorsed on the back:

    "L. M. Dyke."
    "First National Bank of Attalla, by L. M. Dyke, President."

The substance of the defense to the suit upon the note is that the appellee bank never collected the note or received any benefit whatever from it, that the indorsement was an accommodation indorsement by the president without authority, and was ultra vires, and that the transaction was an individual matter of its president, and it is further insisted, if the appellee be liable, that the indorsement on the note was subsequent to the time when the collateral was pledged, and that the note was not at that time an obligation "due, or to become due," and therefore does not fall within the terms of the pledge.

The record, under the admissions of the parties, presents three questions: (1) Is the First National Bank of Attalla bound to the Citizens' Bank & Trust Company for the payment of the Buckmaster and Williams note? (2) If so, may the Citizens' Bank & Trust Company, under the terms of the pledge of collateral to secure a prior note, have the collateral applied to the satisfaction of the Buckmaster and Williams note? (3) If the collateral may be so applied to the satisfaction of that note, may the expense of collection and attorney's fees be added to the sum due upon the note, and the collateral applied to the satisfaction of such expenditures, as well to the principal and interest?

Plainly the note fills all the requisites of negotiable paper under the statutes of Alabama. Ordinarily a person purchasing such a paper for value before maturity from one having it in possession, whose name is upon it, may assume that the title of the holder, as well as the liability of all prior parties, is precisely that indicated by the paper itself. Auten v. United States National Bank, 174 U. S. 125, 19 Sup. Ct. 628, 43 L. Ed. 920. As the appellant had the right to act upon appearances, it is entitled to judgment, unless there be something else growing out of the relations of the parties or the nature of the transaction which charged appellant with notice of the defenses now attempted against the note in its hands. There is nothing outside the paper itself to put appellant upon notice, except that appellant knew that the president of the First National Bank of Attalla, who indorsed the note in its behalf and procured its discount on its account, was also the payee of the note and indorsed it individually. That knowledge, coupled with the face of the paper, only charged appellant with notice that the First National Bank of Attalla had discounted the paper for its president.

There is nothing in the national bank act which prohibits a national bank from loaning money to one of its officers, or discounting a note payable to him, or to prevent it from rediscounting it with another bank. These circumstances, especially where the note rediscounted is for an amount not unusually large compared with other transactions of the bank seeking the rediscount, do not indicate that the paper was not taken and disposed of in due course of business. The rediscounting by a bank of its bills receivable is not unusual in banking circles, and is of frequent occurrence in many localities. The movement of crops at certain seasons of the year involves large use of money and creates demands for loans by local banks to their customers, far in excess of that part of its capital and deposits which a prudent bank usually keeps in cash to meet the or-

dinary current demands of its business. Under such conditions, a bank, however sound and honestly conducted, must either refuse to accommodate its customers, and lose their business or else borrow money temporarily to lend them. In this case, according to all appearances, appellant was justified in assuming that the appellee bank had met such exigency by rediscounting its bills receivable. There was nothing in any of the facts known to appellant which charged it with any duty to inquire into the history of the negotiable paper, or to put it on notice of any defense which might be available against the paper in the hands of any of the original holders.

Looking, however, to the actual case as the proof presents it, the right of recovery against the appellee is still stronger. Appellant, before the note in suit was given, had been the correspondent both of the Bank of Attalla and of the First National Bank of Attalla, which took over most of the business of the former bank. Dyke as president conducted the business of his bank with the appellant, and was often borrowing money from it for his bank, and paying these loans as they matured, and having settlements with the appellant. Dyke, speaking for the appellee bank, frequently advised appellant of the business conditions which made it desirable for his bank to obtain loans and discounts, detailing the sources from which the loans and discounted notes would be paid, going into particulars as to the value of the papers offered, the original Buckmaster and Williams note being one of them, and representing all the while that the bank was strengthening its financial position. If appellant had entertained suspicion of any sort, the conduct of the appellee bank would have disarmed it, and naturally lead appellant to believe that matters were exactly as Dyke represented them to be. The appellee having left its affairs to be conducted by its president, and his conduct being within the range of the authority customarily intrusted to such an officer, it is bound to one who has parted with his money, in good faith in reliance upon his exercise of authority, whatever might be the limitations which the by-laws or the resolutions of the directors, in fact, put upon Dyke's authority in the premises, so long as appellant was not informed of them. Case v. Bank, 100 U. S. 446–455, 25 L. Ed. 695.

Moreover, the appellee, when it sent the first Buckmaster and Williams note to the appellant for rediscount, informed appellant that the business of the Bank of Attalla would soon be merged into that of the First National Bank of Attalla, and that it would assume any outstanding liability of the Bank of Attalla. Dyke testified that the statements in his letters to his correspondent were true. Although examined about other matters, he did not mention any dealings with the appellant on his own account, or claim to have had any. Its officers testified positively that he never had any personal account with appellant. When the original Buckmaster and Williams note was discounted for the Bank of Attalla, the proceeds thereof, $4,850, were placed to its credit, and its accounts, in which said credit was included, were afterwards merged in the account of the First National Bank of Attalla, which itself had the actual benefit of that credit in subsequent settlements it had with its correspondent, and with full

knowledge of the facts, appellee received and retained the money paid by appellant on the discount of that note. It could not repudiate the transaction, and at the same time retain its benefits. Besides, it assumed the outstanding obligations of the Bank of Attalla, and was bound to provide for them. When, therefore, it indorsed the new Buckmaster and Williams note, the one in suit, it was simply indorsing the paper in renewal of its own debt. Appellee was also bound by its indorsement of the note in suit for another reason. Appellee was appellant's banking correspondent. The old paper, payable at appellee's bank, was sent by appellant to appellee for collection. It was appellee's duty to collect it in money, or, if it could not do that, to return it. It did neither. It returned appellee a new note of the same parties, asking that it be received in renewal of the old paper. The appellant declined the arrangement, and returned the new note, insisting upon appellee's indorsement upon it. Appellee returned the new paper with its indorsement, stating that its failure to indorse it was an "oversight." The new note was then accepted by appellant and the old debt thereby extended. Under the circumstances, there was abundant consideration for appellee's indorsement of the new note in suit, and appellant took the negotiable paper in due course of business, and became a holder for value. Muirhead v. Kirkpatrick, 21 Pa. 237; Railroad Company v. National Bank, 102 U. S. 14, 26 L. Ed. 61; Oates v. National Bank, 100 U. S. 239, 25 L. Ed. 580.

Property in a thing involves the right of the owner to deposit or pledge that thing with another person to secure any obligation or to provide for any undertaking of the owner upon such terms and conditions, and for such purposes as he may see fit, so long as the pledge or deposit is not tainted with a purpose to accomplish a result forbidden by law, or contrary to its declared policy. Plainly, when the $10,000 loan was made for which the collateral was primarily pledged, appellee and appellant did not contemplate it would be the only transaction of the kind. On the contrary, it is evident from their relations and dealings they contemplated that the customer then pledging the collateral might obtain further credit or make other loans, and both of them had it in mind that the collateral deposited for the security of the particular debt should, in that event, stand pledged to secure any other indebtedness in future dealings. The language of the pledge is not only consistent with this view, but inevitably excludes any intention to restrict the pledge to the indebtedness then existing. It is the duty of the courts to construe and enforce pledges according to the intent of the parties as gathered from the instrument of pledge or deposit, and the subject-matter and course of dealing to which it relates. The words are emphatic—"To secure the payment of this or any other obligation to said bank." Not content with this, the words are added: "Due or to become due." Provision is made, not only for the application of the collateral in satisfaction of the particular obligation, but for its application as well, if any surplus remained, "to any other obligation, bill, overdraft, or open account, upon which the owner shall be in any way bound, primarily or secondarily, absolutely or contingently, due or to become due." This explicit language is used regarding the disposition of

collateral, which at the time the agreement was entered into could only take place in the future, and inevitably extends the pledge to "any other note or obligation due or to become due." Apter language could not be used to convey the intent to pledge the collateral for the protection of "any other debt" the pledgor might contract thereafter. The original Buckmaster and Williams note, which the parties recognized as one of the debts for which appellee was liable, was outstanding at the time the deposit of collateral was made. By its express terms the pledge secured "any other debt due or to become due." The renewal of the old Buckmaster and Williams debt by giving a new note would not release or destroy the pledge as a security for the debt, or deprive the debt, in its new form, of the benefit of that pledge. We cannot doubt that the collateral in the hands of the receiver is subject, under the terms of the pledge, to the satisfaction of the principal and interest due upon the Buckmaster and Williams note in suit. Selma Bridge Co. v. Harris, 132 Ala. 179, 31 South. 508; Merchants' Bank v. Hall, 83 N. Y. 338, 38 Am. Rep. 434; Hallowell v. Blackstone National Bank, 154 Mass. 359, 28 N. E. 281, 13 L. R. A. 315.

Notwithstanding the provision in the note—"that the maker and indorser hereby agrees to pay any and all costs of collection of whatever nature, either of collecting or attempting to collect, securing or attempting to secure, in part or in full, and also including a reasonable attorney's fee, if not paid at maturity"—we are of opinion under the facts of this case that the collateral in the hands of the receiver cannot be applied in satisfaction of such disbursements, nor can the amount be tacked onto the original debt in order to swell the proportionate amount upon which the creditor shall receive dividends. A national bank is an instrumentality of the government, whose administration is vested in the Comptroller of the Currency, who, in case of insolvency, appoints a receiver and directs his acts. The statutes provide a complete system for the administration of the assets of an insolvent bank, which are trust funds in the hands of the Comptroller. Their purpose is to put upon him the duty of getting in the assets and paying therefrom, ratably all the just claims against the insolvent bank, according to their priorities and equities. The statutes do not contemplate that the assets in his hands are to be charged with the expense of creditors in establishing the validity of their claims, otherwise than as the general law allows them to be taxed in their favor, as in the case of other successful suitors, and then such costs are a part of the general expense of administration, which is to be deducted from the assets before dividends are declared. If a creditor's claim is disallowed, the law opens the court to the dissatisfied creditor to establish his claim, notwithstanding the insolvency and that the assets are being administered by the receiver. But beyond this, save to prevent improper diversion of funds applicable to the particular debt and the like, the courts cannot control the receiver in the administration of the assets. It would defeat the policy of the statutes to enforce a contract by an insolvent bank and its creditor, whereby it is agreed, if a note be not paid at maturity, and the owner of the debt goes to expense in "collecting or attempting to collect" and brings

suit, that the amount of such expense and attorney's fees shall be added to the real debt, and correspondingly swell the dividend to be declared out of the insolvent estate in favor of such creditor, necessarily to that extent prejudicing other creditors. It would give the particular creditor power to displace the general law as to costs, which, when the receiver is sued by a creditor to establish a rejected claim, is part of the system of winding up insolvent banks, and substitute for it a provision that whatever the nature of the expense or the amount spent in litigating his debt the creditor shall recover it as part of the costs to be paid out of the assets of the insolvent bank, and, if the claim itself be a preferred one, that such costs and expenses shall also be a preferred claim against the estate. Every creditor who takes a note with provisions like this is charged with knowledge of the law providing for the administration and settlement of the affairs of an insolvent bank that it enters into his contract, and that it does not contemplate that the creditor who litigates the settlement of his claim with the receiver shall be reimbursed out of the trust funds beyond the statutory costs for his expenses in getting his claim allowed and paid. Besides, the contingency upon which the expense of collection and attorney's fees are to become due is that the note be "not paid at maturity." The contingency upon which the debt is to be increased by the addition of expenses and attorney's fees had not occurred when the insolvent bank was placed in the hands of a receiver; for the note was not then due. When it matured, the insolvent bank was in process of administration, and the payment of the claims of the creditors was necessarily delayed for investigation, the getting in of assets, and the declaration of dividends for ratable distribution to creditors. The bank itself was disabled by the act of law from paying out anything or meeting the note at maturity. Under these circumstances, to increase the debt of a particular litigant by the addition of attorney's fees and the expense of "attempting to collect" simply because he has so contracted, is, in effect, whatever it may be technically, the visitation of a penalty upon other creditors to the extent that the amount allowed the particular creditor for such disbursements diminishes the dividends, which otherwise must be based ratably upon the real indebtedness of the insolvent debtor. Whatever may be the rights of the parties under a note of this kind as to reimbursement for attorney's fees and expenses when suit is brought, or effort made to collect, before the insolvent bank is placed in the hands of a receiver, we are of opinion, where the note did not mature, and suit was not brought or effort made to collect, until the insolvent bank was taken in charge by the receiver for the purpose of liquidation, that the agreement should not be enforced by a court of equity. So long as the debtor is not insolvent, it is no concern of other creditors what the creditor may agree to pay another creditor if he does not meet a note at maturity; but when the agreement attaches other than the ordinary legal consequences of the reimbursement of principal and interest, and the costs of litigation as allowed and taxed in the courts, on failure to pay at maturity, other creditors whose share in a trust fund is diminished thereby have the right to complain of an effort thus to change the law of costs in the

administration of that fund.. Agreements of the kind here• must be construed as intended to apply to ordinary suits brought against the bank while it is a going concern and in charge of its affairs. Complainant is in a court of equity, asking equity, and it must do equity.

As it is admitted that the other claims of appellant have been settled and paid by the receiver in full, and that there remains in his hands a sufficient sum arising from the collection of collateral deposited to secure the payment of appellee's note of February 28, 1906, which collateral appellant surrendered to the receiver without prejudice to its rights, and as we have reached the conclusion that the proceeds of the collateral must be applied in satisfaction of the Buckmaster and Williams note, the decree of the Circuit Court must be reversed, and a decree entered that the complainant's claim, as evidenced by the Buckmaster and Williams note, be allowed for the principal of said note and interest at the rate of 8 per centum per annum, and that the receiver certify such allowance to the Comptroller, the amount thereof to be paid out of the funds in the hands of the receiver arising from the collections on the collateral.

The decree appealed from is reversed, and the cause is remanded to the Circuit Court, with instructions to enter a decree in accordance with the views herein expressed, and otherwise proceed as equity may require.