[No. 742.  Decided August 9, 1893.]

First National Bank of Seattle, *Respondent*, v. S. C. Harris *et al.*, *Respondents*, and Henry L. Yesler and John Leary, *Appellants*.

NEGOTIABLE INSTRUMENTS — POSSESSION BY MAKER — PRESUMPTION — DISCHARGE OF SURETIES — EXTENSION OF PAYMENT — WHAT CONSTITUTES.

Possession by the maker of a promissory note, after it has been in circulation, is presumptive evidence of its payment, although the time allowed for its payment may not have expired.

A note coming into the hands of the maker under such circumstances as to raise a presumption of its payment cannot be pledged by him as collateral so as to bind a surety, although the note may not have matured at the time of its re-issue.

Where the principal of a note pays the holder the money due thereon and receives the note, the sureties are thereby discharged,

although the principal and holder may not have intended to treat the transaction as a payment and cancellation.

Where, after the maturity of a note, the holder thereof takes from the principals thereon a new note extending the time of payment of the debt, without the knowledge of the sureties upon the original note, the sureties are thereby discharged. (HOYT, J., dissents.)

*Appeal from Superior Court, King County.*

*Preston, Carr & Preston, Preston, Albertson & Donworth,* and *W. R. Bell,* for appellants.

*Struve & McMicken,* and *Stratton, Lewis & Gilman,* for respondents.

The opinion of the court was delivered by

STILES, J.—Respondent brought suit to recover upon a promissory note dated October 19, 1882, made by S. C. Harris, D. T. Wheeler, Henry L. Yesler, John Leary and George W. Harris to M. V. B. Stacy, and endorsed by Stacy, without recourse. The complaint alleged that the respondent purchased the note in the ordinary course of business, on or about October 19, 1882, before maturity, for a valuable consideration. The answers of appellants Leary and Yesler alleged that they signed the note only as sureties for S. C. Harris and Wheeler, who were the principal debtors, and that the payee, Stacy, and the respondent had full knowledge of the suretyship. Other affirmative defenses were pleaded, including payment, circumstances discharging the sureties, etc. The reply denied all these allegations. Upon the trial the respondent was not content with the production of the note, and proof of the amount due, but went into a showing of the way in which the note came into its possession, and the purpose for which it was held, in substance as follows: In 1882 one Mackintosh was the owner of a set of abstract books, which S. C. Harris and Wheeler were desirous of buying, but for the purchase of which they did not have the money, ten

thousand dollars. Mackintosh was willing to sell for $5,-000 cash and $5,000 in the notes of Harris and Wheeler, with suitable endorsers or sureties. George W. Harris was doing business in Seattle as a banker, under the name of G. W. Harris & Co., and he was willing to assist in the purchase (S. C. Harris being his brother) by ''carrying'' Harris and Wheeler for $5,000. Leary and Yesler were willing to become sureties on the time notes. With these preliminary arrangements the sale was ready for consummation. But it was either not then convenient for G. W. Harris to advance $5,000 in cash, or there was some other reason which did not appear, and the arrangement took a different turn. All parties executed and delivered to Mackintosh three notes, two of which were the time notes agreed upon, and the third of which was the note in suit. Why this note contained the name of Stacy as payee nobody could remember; but the note went to Mackintosh and was accepted by him, and the sale of the abstracts was completed by their delivery to Harris and Wheeler. This showing established the fact that Leary, Yesler and G. W. Harris were sureties only.

At the date of the note, October 19, 1882, G. W. Harris was promoting the organization of the respondent First National Bank; permission had been granted to it to do business by the comptroller of the currency, September, 26, 1882, and it commenced business November 15th thereafter. Its president was George W. Harris, one of the sureties upon this note. The exact date when the note came into the bank could not be fixed by the witnesses of their own knowledge, but it was at the same time that Harris and Wheeler made a certain note to the bank for $5,-000, and that time the bank's books showed to be December 22, 1882, and, whenever it was, the bank received it from S. C. Harris and D. T. Wheeler. The first transaction of Harris and Wheeler, in which a note passed, was on the

date last mentioned — a note for $5,000, due in six months after date, numbered 150. On the same day the bank's cash book showed a charge against note 150 of $5,000. Thus, as far as the books go, this sum was paid out upon the note of Harris and Wheeler, and not for the purchase price of the note in suit. Nowhere else in the bank's books does any sum appear as charged to the purchase of this note.

But it was not claimed at that stage of the trial that this note was in fact purchased at any time. On the contrary, the evidence for the plaintiff was wholly directed to the point of proving that it was at all times held as a collateral to the note given by Harris and Wheeler, December 22, 1882, and the renewal notes which succeeded it every six months down to 1889, and in our judgment the effort was completely successful. But once in all the history of the note did it appear in the bank's books, viz., December 22, 1883, when a brief memorandum was made of it upon the margin of the bills receivable book, showing it to be collateral to a renewal note of that date.

Therefore, at the close of plaintiff's case there was before the jury a showing that Harris and Wheeler had, by some means, obtained possession of this note, and had, on December 22, 1882, pledged it to the bank, of which G. W. Harris was president, as collateral to their note No. 150, for $5,000, and that the latter note had not been paid, except by the giving of renewal notes for the same debt. Appellants moved for a non-suit, on the ground that where a promissory note upon which some of the makers are sureties only, is found, after negotiation, in the hands of the principal obligor, it is presumed to have been paid; and that if the principal obligor attempts to negotiate that note to a person having knowledge of the suretyship, the person with such knowledge obtains no title to the note as against the sureties; but the motion

was denied.   Nothing is better settled than the legal proposition here laid down.

Possession by the maker of a promissory note after it has been in circulation is presumptive evidence of its payment.   *Hollenberg v. Lane*, 47 Ark. 394 (1 S. W. Rep. 687); *Turner v. Turner*, 79 Cal. 565 (21 Pac. Rep. 959); *Stevens v. Hannan*, 86 Mich. 305 (48 N. W. Rep. 951; 49 *Id.* 874); *McGee v. Prouty*, 9 Metc. (Mass.) 547; *Heald v. Davis*, 11 Cush. 318; *Penn v. Edwards*, 50 Ala. 63; *Sutphen v. Cushman*, 35 Ill. 186; *Walker v. Douglas*, 70 Ill. 445; 2 Randolph Com. Paper, § 941; Lawson's Pres. Ev., rule 75*b*.

And a note coming into the hands of the maker, after payment, cannot be re-issued by him so as to bind a surety. *Hopkins v. Farwell*, 32 N. H. 425; *Eastman v. Plumer*, 32 N. H. 238; *Lancey v. Clark*, 64 N. Y. 209; *Cason v. Heath*, 86 Ga. 438 (12 S. E. Rep. 678); 2 Brandt, Suretyship, § 333.

The application of these rules to this case is evident.   A pledge of collateral passes to the pledgee the title of the thing pledged (Jones on Pledges, § 9); and to make a valid pledge the pledgor must have the title (*Id.*, § 52); or the express or implied authority of the true owner of the title (*Id.*, § 53).   But Harris and Wheeler never had any ownership of this note as against their sureties, because they could get it into their possession so that they could in their own right control it or pledge it for their debts in no possible way which the courts would not construe to be a payment, unless the sureties consented.   If they could ever have any property in the note they could sue on it, which would be absurd.   The face of the note showed that it had been negotiated, for it was payable to Stacy,' who had endorsed it, so that coming in that shape to the bank from the hands of Harris and Wheeler it bore its invalidity patent in every line.   But, above all, the president of the

bank was a signer of it, and knew the circumstances of the suretyship; and the fact of the issue to Mackintosh, and his knowledge was the knowledge of the bank. While Harris was its president the bank could not be an innocent holder of this paper through any transaction in which he acted for it.

The fact that the time allowed by the note for its payment had not expired made no difference in the presumption of payment arising from Harris' and Wheeler's possession of it; it was payable on or before January 1, 1885, so that the principals would have had the right to take it up at any time. In *Stevens v. Hannan, supra,* the note was of the same kind.

Therefore, upon the proofs as they stood at the close of plaintiff's case, we think there should have been a nonsuit. But, inasmuch as the whole case is here, and the greater part of the briefs of both sides was taken up with argument of other features of the case, we shall advert to them briefly.

The subsequent proofs on both sides served to bring out more clearly, and to make it certain, that the note came into the bank December 22, 1882. Mackintosh, according to his recollection and his books, had it until that day; and on that day Wheeler gave him $5,084.50, and took away the note. Mackintosh supposed the money was given him in payment of it, though contrary to what he believed he would usually have done, he did not stamp or mark it paid when he surrendered it. *Eastman v. Plumer* and *Lancey v. Clark, supra,* are to the point that a transaction of this sort is payment where the sureties have no knowledge of it, whether the principal of the note and the subsequent holder intended it to be so or not. The holder of the note has the right to know what is to be done with the paper which he surrendered, and to presume, if nothing is said, that it has been paid so that there will be no responsibility on his part.

The tendency of the latter evidence, as affecting the bank's relation to the note, was, if anything, away from its theory that it took the note as collateral, and suggested a purchase of it from Mackintosh, the taking of a new note from Harris and Wheeler being but a fiction to enable it to comply with the national banking law limiting the time of loans. But if the theory of a collateral security be dropped, and that of a purchase be adopted, the case of the bank immediately runs foul of another well settled rule, viz.: that if the holder of a promissory note extends the time of payment, sureties will be discharged.    Through a period of at least three years after the maturity of the note, and while Leary and Yesler were ignorant that the bank had the note, and again after they knew it, Harris and Wheeler were giving renewal notes every six months for $5,000 each, and interest notes in addition, none of which were paid. Now, under the charge given by the court, the jury could only find that each of these renewal and interest notes was a binding extension of the time for payment of the *debt* which was represented by all the notes together.    It is possible that, as the charge was worded, the jury may have considered that there was a fine line of distinction between an extension of one note and the other, so that the note in suit was left intact, no renewal note having been given specifically to cover it as a note.    We do not believe the court below meant any such thing; if it had, it would have told the jury that all the renewal and interest notes were without consideration and void, and not to be considered in the case.

When the principal and surety are bound to the creditor by a note or other negotiable instrument, if the creditor take from the principal a new note or bill of exchange for the *debt*, falling due after the period when the original obligation matures, this generally amounts to an extension of time and discharges the surety.   Brandt, Suretyship,

10—7 WASH.

§ 363.    There are many cases in the books where peculiar circumstances have operated to avoid this rule, but we do not find any such circumstances here.    Each renewal note was certainly given to enable Harris and Wheeler to have more time to pay, and was a valid contract for an extension which would have prevented suit on the original note for that time; for, if nothing else, there was a higher rate of interest charged on both the renewal and the interest notes, the rate being one per cent. per month on these, as against ten per cent. per annum on the original note.    Counsel for respondent here seek to shape the case into this form, viz.: That it was the original understanding of all parties that notwithstanding that this note was made payable to Stacy, and was to be held by Mackintosh, the latter was to receive his money in sixty days, and the note was to go to the bank as soon as it should be organized.    To sustain this theory there is the fact that it was payable "at the First National Bank of Seattle;" that it was not due for more than three years; and that Mackintosh testified that he was to have his money in sixty days, or a bonus of $100. And it may be said that the atmosphere of the case at its close rather indicated that the bank was expected to furnish the money to pay Mackintosh his $5,000.    But it nowhere appeared that the bank, or its then agent, G. W. Harris, was stipulating for the names of these sureties as a condition precedent to its advancing the money.    It was Mackintosh who said that he would not have taken the note of Harris and Wheeler without security, and it was for his benefit that sureties were procured.    But conceding it to be the proper solution that these sureties signed with the distinct understanding that the bank would take the note, and that Wheeler's act in taking the money out of the bank and receiving the note from Mackintosh in exchange for it, was as agent for the bank, it would then follow that the bank owned the note, and the rule as to extensions

would apply with even greater force than before. All this, however, is to be inferred, if at all, from two or three circumstances, and against the direct testimony of witnesses, and when weighed in the balance against the evidence which the bank furnishes through its books, and its former president and other officers, that it always treated the note as a mere collateral, it amounts to nothing.

And so we conclude, that, as when the plaintiff rested, the non-suit should have been granted, and the subsequent proceedings not having in any way deprived the appellants of the right to that disposition of the case, the decision should now be that the judgment be reversed, and the cause remanded for the entry of a non-suit.

So ordered.

DUNBAR, C. J., and ANDERS and SCOTT, JJ., concur.

HOYT, J. (*dissenting*). — I am unable to agree with the conclusion to which the majority of the court have arrived in this case. In my opinion the testimony and the circumstances surrounding the transaction are consistent with but one view as to the purpose for which the note in controversy was given, and that was the securing to the respondent the repayment of the sum of five thousand dollars to be advanced by it as the cash payment to Mackintosh on the purchase of his abstract. Such having been the purpose for which the note was executed, it seems clear that it was never received by said Mackintosh as security for such cash payment in such a manner that he became the owner of the note. His holding of the note was in my opinion only a temporary expedient pending the completion of the organization of the respondent, for whose use the note was originally made, and that it was the understanding of all the parties interested in the note that it should pass to the respondent as security for the five thousand dollars which was to be paid to Mackintosh as soon as it was so organ-

ized that it could furnish the money. That such was the nature of the transaction is, perhaps, not shown by any direct positive proof to that effect, but the circumstances taken separately and together are so consistent with this construction of the transaction, and so inconsistent with any other construction, that my mind is satisfied. There is no reason whatever shown why this note was drawn for the time that it was which is consistent with any other theory, nor is there any other theory which will account for the fact that it was made payable at the First National Bank. If the understanding at the time it was executed was that it was to go to Mackintosh as his property, there would have been every reason why it should have been made payable at his banking house, and none whatever for its being made payable at the banking house of the respondent. Beside, the entry in the books of Mackintosh, and the memorandum made by him on the back of the note, are inconsistent with the theory that he had taken the note in the ordinary course of business, and as his property, but are entirely consistent with the theory above suggested that it was left with him until the respondent was in a condition to advance the money and receive the note as security therefor, in accordance with the original understanding between George W. Harris and the other makers of the note. If the above correctly interprets the original transaction, it must follow that when the note came into the possession of the respondent it became its property for the purpose of securing to it the payment of the amount therein named by the makers, and, if this was so, there is only one reasonable interpretation as to the nature of the transaction by which the first note of Wheeler and Harris to the respondent was made, and that is that it was so made simply for the purpose of enabling the bank to make a better showing as to the nature of the paper which it held so far as the time of payment was con-

cerned.   There would be no reason whatever in its being made as collateral security to the other note, for the reason that both of the makers thereof were already bound to the bank by their signatures to the original note, nor would there be any reason for its being made as the principal note evidencing the debt for the same reason, and for the further reason that it would not be business for the bank, having security for such debt in the shape of the signatures of five persons to a note, to take another signed by only two of the persons so signing the principal note, and hold such principal note as collateral thereto.   If such was the nature of the transaction when the first note of Wheeler and Harris was executed to the bank, it is but reasonable to suppose that all the notes executed in renewal thereof were of the same nature, and that none of them at any time became the principal security for the debt, or in any manner represented the same.

It follows that the course of dealing in relation thereto was purely a matter of convenience as between the respondent and said Wheeler and Harris, and that the debt or principal note held as security therefor was in no manner affected by such transactions.   With this view of the facts, the instructions of the court to the jury were substantially correct, and its findings amply warranted by the proofs, and, in my opinion, the judgment rendered thereon should be affirmed.