## 𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉.

INDIA W. DUNNINGTON, EXECUTRIX, ETC. v. BANK OF
CREWE
J. W. FERRELL v. BANK OF CREWE
SUE M. PATTERSON, EXECUTRIX, ETC. v. BANK OF
CREWE.

January 14, 1926.

1. BILLS, NOTES AND CHECKS—*Accommodation Note—Pledge and Collateral—Liability of Accommodation Endorser—Case at Bar.*—In the instant case a note was executed and endorsed by an accommodation endorser expressly to secure a line of credit for the maker, a corporation, from a bank. This collateral note was not discounted but used pursuant to the agreement as collateral security for the debt evidenced by several and successive principal notes of the corporation. The accommodation endorser died before the collateral note matured. Another endorser, acting for the corporation, wrote to the attorney of the accommodation endorser's executrix, calling his attention to the obligation and stating that the bank would no doubt hold the note as security against the unpaid balance. The attorney replied, making no suggestion that the collateral note was to be withdrawn as security, and acquiescing in the suggestions as to handling the matters contained in the endorser's letter, and after that the collateral note was repeatedly pledged for the corporate indebtedness to the bank.

 *Held:* That the several extensions of the indebtedness of the corporation, after the death of the accommodation endorser, did not release the estate to the endorser.

2. SURETYSHIP—*Accommodation Endorser—Extension of Time—Pledge and Collateral Security*—An accommodation endorser being a mere surety is released by extension of time and renewals of the original note, without his consent, but an extension of time on a principal note does not release the collateral which is pledged to secure its payment.

3. PLEDGE AND COLLATERAL SECURITY—*Accommodation Endorser—Pledge of Note to Secure Credit from a Bank—Renewals—Case at Bar.*—A collateral note was executed to be pledged for the payment of a debt, which indebtedness was to be evidenced from time to time by

principal notes. There was express authority from the accommoda-
tion endorser to pledge the collateral note for renewals of the
principal notes as they should, from time to time, be renewed.

*Held:* That, the pledge fixed the liability of an accommodation en-
dorser on the collateral note, and that neither his death nor the
maturity of the collateral note, nor the denial of liability by his
executrix, without more, could release him from that liability.

4. PLEDGE AND COLLATERAL SECURITY—*Bills, Notes and Checks—Whether
Collateral Note and Principal Notes Should be Held to be a Single Trans-
action—Case at Bar.*—In the instant case a note was executed to be
used as collateral to procure a line of credit from a bank for a cor-
poration, and it was contended that, as the corporation was the maker
of the collateral note and also of the principal notes, the transaction
should be considered a single one, and that the liability of the
endorser on the collateral note was no greater than if they had been
endorser on the principal notes.

*Held:* That to sustain this contention would be to ignore the fact
that it was expressly agreed that the collateral note was to be used to
establish a future credit at the bank, to secure a succession of prin-
cipal notes which of necessity would mature and be renewed from
time to time.

5. PLEDGE AND COLLATERAL SECURITY—*Pledge of Note to Secure Another
Note of Maker—Extension of Time.*—It is not usual to pledge a note
of the principal debtor for another debt of the same maker, but
when this is done the same rule should be applied as if the note
pledged were the note of another maker, which is that the extension
of the principal note, or debt, does not release the collateral note so
pledged.

6. BILLS, NOTES AND CHECKS—*Negotiable Instruments Law—Purposes of
Act—Scope of Act.*—The negotiable instruments law (Code of 1919,
secs. 5563-5757) was enacted to secure uniformity and solve doubts,
and it will be held to solve all questions with reference to negotiable
paper which it undertakes to settle.

7. BILLS, NOTES AND CHECKS—*Collateral Note—Negotiable Instruments
Law—Release of Endorser on Collateral Note by Extension of Time on
Principal Notes.*—Under the negotiable instruments law (Code of
1919, secs. 5563-5757) an accommodation endorser on a collateral
note, given to secure the maker a line of credit from a bank, is not
released from his liability by an extension of time of the principal
note for which the collateral note is pledged.

8. BILLS, NOTES AND CHECKS—*Accommodation Endorser—Liability to
Holder for Value.*—An accommodation endorser is just as much
liable to a holder for value, under section 5589 of the Code of 1919,
as if his endorsement had not been for accommodation.

9. BILLS, NOTES AND CHECKS—*Negotiable Instruments Law—Holder in Due
Course—Pledge and Collateral Security.*—One taking a negotiable

paper before maturity as collateral security is a holder in due course, within the meaning of section 5614 of the Code of 1919, and the fact that a note is assigned as collateral security does not make the transfer any less effective.

10. BILLS, NOTES AND CHECKS—*Negotiable Instruments Law—Discharge of Party Secondarily Liable—Extension of Time—Section 5682 of the Code of 1919.*—Code of 1919, section 5682, clause 6, providing for the discharge of those secondarily liable, cannot be extended to release endorsers upon a collateral note because of the extension of time on another instrument to which they were not parties, but for the payment of which the collateral note was pledged. The section clearly refers only to and specifies the identical instrument upon which the endorser is liable, and under clause 6 of the section the right of recourse even against such party to the instrument may be expressly reserved notwithstanding the extension of time to the maker.

11. BILLS, NOTES AND CHECKS—*Negotiable Instruments Law—Discharge of Party Secondarily Liable—Section 5682 of the Code of 1919.*—The rights and liabilities of an endorser of a collateral note pledged to secure payment of a principal note of the maker, are determined by the negotiable instruments law (Code of 1919, secs. 5563-5757), the statute is exclusive and conclusive and there appears to be no other way to discharge an endorser who is secondarily liable upon a negotiable instrument to a *bona fide* holder thereof for value, except in one of those ways specified in section 5682 of the Code of 1919.

Error to a judgment of the Circuit Court of the city of Petersburg, in a proceeding by motion for a judgment for money. Judgment for plaintiff. Defendant assign error.

*Affirmed.*

.The opinion states the case.

*Jos. M. Hurt, Jr., Plummer & Bohannan, Bernard C. Syme* and *Richard T. Wilson,* for the plaintiffs in error.

*W. Moncure Gravatt, Louis S. Epes* and *Allan Epes,* for the defendant in error.

PRENTIS, P., delivered the opinion of the court.

These three cases, involving substantially the same questions, were argued together. This is a general statement of the facts shown by the record:

[1] This is a motion instituted by the Bank of Crewe against Alfred Friend Trunk Corporation, Alfred Friend, Sue M. Patterson, executrix of E. H. Patterson, J. W. Ferrell, and India W. Dunnington, executrix of W. G. Dunnington, deceased, to recover $8,890.-79, with interest from May 10, 1924, claimed to be due upon a note dated December 15, 1921, for $20,000, drawn by Alfred Friend Trunk Corporation, payable one year after date, to its own order, endorsed by the maker and by Alfred Friend, E. H. Patterson, J. W. Ferrell and W. G. Dunnington, containing a waiver of presentment, demand, protest and notice of protest, which note is held by the bank as collateral security for the payment of a certain other note, dated November 13, 1923, for $13,500, drawn by the corporation, upon which the balance claimed is $8,890.79, with interest from May 10, 1924. The note for $20,000, sued on, will be called the collateral note, and for a correct understanding of the question involved must be clearly distinguished from the other series of notes, for the payment of which it was pledged and which will be called the principal notes. These principal notes were drawn by the Alfred Friend Trunk Corporation, payable to its own order, endorsed and discounted for its account by the Bank of Crewe. They were on forms providing for the pledge therewith of collateral security, and each of them in effect provides that the property so deposited as collateral security for the payment of that and any other liability of the maker to the holder thereof, then due or to become due, or that might thereafter be contracted, and the col-

lateral note so pledged is accurately described by date, amount, the names of the maker, endorsers and maturity.

There were two of these collateral notes, each for $20,000, drawn by the trunk corporation, payable to its own order one year after date, endorsed by it and by Alfred Friend (who was its president), E. H. Patterson, J. W. Ferrell and W. G. Dunnington. One was dated December 15, 1920, and when it matured the other, dated December 15, 1921, was substituted therefor, and this is the note sued on. Dunnington was purely an accommodation endorser, while Friend, Ferrell and Patterson were stockholders in the trunk corporation, Alfred Friend being president and active manager. These collateral notes were delivered to Alfred Friend, president of the Alfred Friend Trunk Corporation, under the circumstances to be hereinafter stated, especially to secure a line of credit for the Alfred Friend Trunk Corporation at the Bank of Crewe. Neither was discounted, but they were successively used, pursuant to the agreement, as collateral security for the debt evidenced by the several and successive principal notes referred to. The corporation had previously been borrowing from the Bank of Crewe, its note for $15,000, held by the bank, matured December 15, 1920, and it desired to secure a renewal of this note as well as to have a larger line of credit at the Bank of Crewe. The bank, in response to its request, agreed to lend the corporation as much as $20,000 upon sufficient security or collateral and Friend indicated that he would offer the endorsements of himself and the other three who have been named.

Referring specifically to Dunnington, whose executor contests liability here most vigorously, Friend procured his endorsement on the first of the collateral

notes of December 15, 1920; and in order to facilitate the handling of maturities, because Ferrell and Dunnington were absent much of the time, it was made payable one year after its date, though the principal note discounted by the bank was payable three months after its date.

In execution of the purpose indicated, the corporation executed its principal note for $19,000, payable to its own order three months after date, and for its security pledged the $20,000 collateral note. The bank discounted this principal note of $19,000, credited the proceeds to the trunk corporation, and out of the proceeds the corporation paid its then past due note for $15,000. The $19,000 principal note was renewed from time to time by the Trunk Corporation, and on each occasion the $20,000 collateral note already held by the bank was repledged as security. This principal debt had been reduced to $18,000 December 15, 1921, when the first of the collateral notes matured. Then the second of the collateral notes, and the one now sued on, was executed December 23, 1921, but dated December 15, 1921, and substituted as collateral security for the principal note. At that time the indebtedness was again increased to $19,000, which was the amount of the principal note renewed as of December 15, 1921.

This course was pursued from time to time until this motion was instituted—that is, the principal notes were curtailed and renewed from time to time, until when the last principal note was executed, November 13, 1923, the debt had been reduced to $13,500, secured by the pledge of the collateral note of December 15, 1921, for $20,000. This principal note at the time the suit was brought was also subject to further credits, reducing the principal sum due thereon to $8,890.79.

The endorser, Dunnington, died before this collateral

note matured, and between the date of his death and its maturity Friend, acting for the corporation, wrote to Dunnington's son (who was also the attorney of his mother, the executrix, vested with authority to repre- sent her as attorney and agent, and particularly with reference to this collateral note), calling his attention to the obligation and expressing his regret that he would not be able to pay off the principal note at the time of its maturity, December 15th.   In that letter Friend wrote that "the bank will no doubt hold the original note as security against the unpaid balance;" that he had talked with the cashier of the bank upon the subject, and that it would not be his disposition to push for settlement or be unreasonable.  In response to this letter the attorney for the executrix replied, making no suggestion that the collateral note was to be withdrawn as security, and saying, among other things: "I see nothing else to do except to handle it as outlined in your letter. I want it to be understood that both Mr. Ferrell and yourself are to remain as en- dorsers on this note."   This was in substance com- municated to the bank by Friend, and the collateral note has been repeatedly pledged for the indebtedness since that time.   Then, thereafter, on September 6, 1923, the attorney wrote to Friend (but not to the bank) that in his opinion there was no legal liability on the part of Dunnington's estate to pay any part of this note; that his father "was an endorser for a fixed time and when that expired and a new note was given extending the time, certainly the bank knew that he was not a party to the extension and was consequently released."   The principal note was twice thereafter renewed.

There was a judgment against the drawer and en- dorsers of the collateral note for the balance claimed, $8,890.79, with interest.

There are three assignments of error, but the petition states correctly that they involve the same question, which is thus stated: "The sole question presented for decision is whether or not the several extensions of the indebtedness of the Alfred Friend Trunk Corporation after the death of W. G. Dunnington served to release him and his estate as an endorser." The trial court held that there had been no such release, and gave the jury this instruction:

"The court instructs the jury that if they believe from the evidence that the $20,000 note sued on was executed by the defendants and was deposited with the plaintiff as collateral security for a loan made by the plaintiff to Alfred Friend Trunk Corporation, in manner and form of the form for collateral pledge set forth in Exhibits 9 and 1 or in Exhibit No. 3; that the said loan has not been paid, and that the Bank of Crewe is still the holder of said $20,000 note; then they must find in favor of the plaintiff against the defendants for the balance due on the debt for the payment of which said $20,000 note was pledged."

[2] The issue, then, is quite sharply defined. For the endorser it is claimed that being an accommodation endorser and a mere surety, he has been released because of extensions of time and renewals of principal notes after the death of Dunnington.

The proposition of law involved in this claim is admitted and is too well settled to require the citation of authority.

On the other hand, the creditor bank relies upon a rule of law which is equally well settled, namely, that the extension of time on a principal note does not release the collateral which is pledged to secure its payment.

There is no substantial conflict in the testimony,

and nothing outside of the facts which we have stated which affords any aid in the determination of this question of law arising out of the facts. We shall not attempt to review all the cases cited, for each of the propositions of law relied on is amply supported. We have to determine which of these rules applies to these transactions.

[3] It is frankly conceded that on each occasion, when the collateral notes were first pledged to the bank, Friend had the express authority from the endorsers thereof to make the precise use of them which he did make—that is, to pledge the collateral note for the renewals of the principal notes as they should from time to time be renewed. This concession (with a reservation) is thus expressed in the reply brief for Dunnington's executrix: "We admit freely that Friend had the right, in the first instance, to pledge the note and continue doing so until it matured, provided Dunnington was still alive—he was the agent of Dunnington for that purpose. We do not concede that he could have done so after its maturity, even had Dunnington been alive, because Dunnington chose to lend his name for one year, not for an indefinite time."

We find ourselves, however, unable to understand why either the maturity of the collateral note or Dunnington's death had any effect whatever, under the conceded facts of this case, upon Dunnington's legal obligation. The collateral note was executed to be pledged for the payment of the debt, which indebtedness was to be evidenced from time to time by the principal note. That pledge fixed Dunnington's liability. Neither his death nor the maturity of the collateral note, nor the denial of liability by his executrix, without more, could release him from that liability.

1. The question, as it seems to us, involves first a construction of the contract. Has Friend, in the use of this collateral note, violated his agreement with Dunnington, and even if he has, how can that affect the rights of the bank, a *bona fide* holder thereof for value?

Much reliance is placed by the attorneys for Dunnington upon the latter clause of this statement from Jones on Collateral Securities, section 518-b, quoted in the brief thus: "A surety on a note which is the principal debt is discharged by an extension of that note, without the surety's consent. A surety on the collateral note is not so discharged if the collateral note is an independent obligation resting on a distinct consideration; but if the consideration of the principal note and of the collateral are the same, an extension of the principal note without the consent of the surety discharges him."

[4] The contention based thereon is, that inasmuch as the trunk corporation was the maker of both the principal and collateral notes, it should be held to be a single transaction, based upon one and the same consideration, and therefore that the endorsers on the collateral note assumed just the same and no greater liability than if they had been the endorsers of the principal note. Of course, if, under the facts of this case, this contention be correct, and Dunnington is held to be in the position of and subject only to the liability of an endorser of the principal note, then the extension of time without his consent, and renewal of the principal note after his death, without notice and consent, releases him as endorser. To uphold this contention, however, would be to ignore the contract which contemplated such renewals.

The four cases cited in Jones on Collateral Securities

to support that citation have slight application to the facts of this case, and can easily be distinguished. They are:

*Slagle* v. *Pow*, 41 Ohio St. 605, which is chiefly relied on and extensively quoted from. There were but two notes there involved, one principal note and one collateral note. The collateral note was given for the express and only purpose of securing the payment of the principal note. Here, however, as has been shown, when this collateral note was given it was expressly agreed that it was to be used to establish a future credit at the bank, to secure a succession of principal notes which of necessity would mature and be renewed from time to time. In this contract there was no limit to the number of times? or periods, for which the principal note was to be renewed, unless it is to be inferred from the bare fact that the collateral note was payable twelve months after its date.

*Price* v. *Dime Savings Bank*, 124 Ill. 317, 15 N. E. 754, 7 Am. St. Rep. 367, likewise refers to a specific obligation, and applies the generally accepted rule, that when a third person pledges his property as security for the payment of the obligation of another, the property stands in the position of a surety of the debtor and any change in the contract of suretyship which would discharge a surety will release and discharge the property held as collateral.

In *Dodgson* v. *Henderson*, 113 Ill. 360, there was no collateral note involved, and the surety who was there released was the surety on a single promissory note which was extended without his knowledge or consent.

In *First National Bank* v. *Harris*, 7 Wash. 139, 34 Pac. 166, the maker of a note acquired it before maturity, and hence there was a presumption of its

payment. It was held that it could not be thereafter pledged by the maker as collateral so as to bind a surety, although it had not matured at the time of its reissue; and the same rule was applied as to release of a surety because of the extension of time to the principal for a valid consideration without notice to the surety.

We think the other cases cited in the briefs in support of the contention may also be easily distinguished. Among them is *National Park Bank* v. *Koehler*, 204 N. Y. 174, 97 N. E. 468. There Koehler was an endorser of the original note, upon which the maker, prior to maturity, requested an extension of time and the acceptance of new notes payable in instalments, which the bank agreed to do provided the new notes should likewise be endorsed by Koehler. Koehler, however, was outside of the country and so the maker suggested to the bank to hold the old note with Koehler's endorsement as collateral for the new ones. The bank did not reply to this letter, but took the new notes, and when these were not paid the bank sued Koehler as endorser on the original note. The court held that he was released because of the extension granted to the principal debtor. So that case bears so little resemblance to this that its only relevance is as helpful in apprehending the principle involved, and this is indicated in that opinion thus:

"In this case the agreement does not, in terms, reserve the holder's remedies against the defendant; for the bank was to 'hold the old note, with Mr. Koehler's indorsement, as collateral, until the new notes are paid.' That was the agreement. It is true that the plaintiff had previously returned these notes and insisted upon having the defendant's indorsement; but how can that fact import a new term into the eventual

agreement? When they were, again, sent without that indorsement, they were retained without a demur to the suggestion that the company be allowed to make payment through them and that the old note be held as collateral. What the respondent claims, under the arrangement as made, is that, under the circumstances, and with the protest of the original note, what was meant and effected was the preservation of the defendant's obligation, 'as it originally existed with all his rights unimpaired.' So far as the protest of the old note is concerned, that fact cannot help out the agreement, if that agreement did operate to suspend the plaintiff's right of action against the maker. The fact goes to show that the plaintiff accepted the arrangement, and, doubtless, supposed the defendant's liability to have been fixed and preserved. How, then, is the agreement to be interpreted. It is not conditioned upon the defendant's consent to the arrangement; which would have left him free to proceed upon the old note by taking it up and, rejecting the new notes, to enforce repayment against the maker. Its effect was to preclude the plaintiff from maintaining any action upon the note against the maker; for the company could have objected that, under their agreement, it was to be held as collateral until the new notes were paid. Thus the right of action was, necessarily, suspended during the interval." The point upon which that case was decided was that Koehler was precluded from maintaining any action on the note against the maker, because the holder of that particular note upon which Koehler was the endorser had extended the time for payment. It is insisted here that upon the extension and renewal of the principal note, the right of action upon another note, the collateral note, was suspended. We think the funda-

mental error about this contention is in the assumption that the two notes, because they arose out of the same general purpose, are to be construed as showing an indivisible contract, and that therefore the endorsers upon the collateral note stand here just as if they had been endorsers upon the principal note. These endorsers were not even parties to the principal note, and we do not see how the action of the bank as the owner of the principal note could have prejudiced any of their legal rights as endorsers of the collateral note. We do not perceive any injury to or obstacle placed in the way of these endorsers. They knew that the extensions were being granted, and it was for the express purpose of facilitating such extensions that they endorsed the collateral note as a continuing security for such extensions. They might have at any time paid the principal indebtedness of the maker of the collateral note, the trunk corporation, for which the collateral note had been pledged, and having paid the debt due the bank, might have sued the maker, not upon the principal note which had been extended, to which they were not parties, but upon the collateral note which had not been extended, of which the corporation was also the maker and so responsible to them as endorsers for default in its payment.

This view is supported by *Commercial National Bank* v. *Saunders*, 139 La. 622, 71 So. 893. There Powell Bros. & Saunders Company made their note for $15,000, payable to their own order, to be used as collateral for a loan they desired to obtain, and the defendants endorsed this note for accommodation. The maker obtained a loan from the plaintiff bank, executed its note therefor, and gave this $15,000 note as collateral. When the principal obligation became due, half of it was paid and the principal note was twice

renewed for the balance due. The court disposes of the defense that the endorsers on the collateral note had been released thus: "Another of the defenses is that by the extension of time granted on the principal note the indorsers on the collateral were released. The defendants were neither sureties nor indorsers on this principal note, and therefore what was done or not done in connection with it does not concern them. The case of *Alter* v. *Zunts*, 27 La. Ann. 317, cited by defendants, is not in point. There the party pleading release was an obligor on the principal obligation."

[5] The same view is taken *In re Alldred's Estate*, 229 Pa. 632, 79 Atl. 143, where it is held that the endorsers on a demand note given as collateral security to an endorser on another note of the maker are not relieved from liability because of renewal of the other note, where there were no renewals or extensions of the note which they had endorsed. The contract which is here proved is both clear and conclusive. *Citizens B. & T. Co.* v. *Thornton*, 174 Fed. 761, 98 C. C. A. 478. Under that contract the collateral note should be held to be not merely security for any particular note for which it was pledged, but rather as given to establish a credit and to secure the ultimate payment of the debt. It is not usual to pledge a note of the principal debtor for another debt of the same maker, but when this is done the same rule should be applied as if the note pledged were the note of another maker, which is that the extension of the principal note, or debt, does not release the collateral note so pledged.

[6, 7] 2. Moreover, it seems to us that the Negotiable instruments law, Code, sections 5563-5757, inclusive, is likewise decisive. That this statute was enacted to secure uniformity and solve doubts is of course generally accepted, and that it will be held to solve all

questions with reference to negotiable paper which it undertakes to settle is well indicated in this from Chief Justice Rugg in *Union Trust Co.* v. *McGinty*, 212 Mass. 205, 93 N. E. 679, 28 Ann. Cas. 1913C, 526: "While it does not cover the whole field of negotiable instrument law, it is decisive as to all matters comprehended within its terms. It ought to be interpreted in such a way as to give effect to the beneficent design of the legislature in passing an act for the promotion of harmony upon an important branch of the law. Simplicity and clearness are ends especially to be sought. The language of the act is to be construed with reference to the object to be attained. Its words are to be given their natural and common meaning, and the prevailing principles of statutory interpretation are to be employed. Care should be taken to adhere as closely as possible to the obvious meaning of the act, without resort to that which had theretofore been the law of this Commonwealth, unless necessary to dissolve obscurity or doubt, especially in instances where there was a difference in the law in the different States."

That act does cover the point involved and so solves any doubts which might otherwise exist as to this controversy.

[8, 9] Code section 5589, cited in *Payne* v. *Zell*, 98 Va. 294, 36 S. E. 379, provides that where the holder has acquired a lien on the instrument, arising either from contract or by implication of law, he is deemed a holder for value to the extent of his lien. So that the bank here having had a legal lien, still has all of the rights of a holder for value, unless its debt has been satisfied or its lien released. Notwithstanding the fact that Dunnington was an accommodation endorser, he is just as much liable on the instrument to the bank as a holder for value as if he had not been an

accommodation endorser. That one taking a negotiable paper before maturity, as collateral security, is such a holder in due course, within the meaning of section 5614, and that the fact that a note was assigned as collateral security does not make the transfer any the less effective, is shown by *Anderson* v. *Union Bank*, 117 Va. 1, 83 S. E. 1080, and *Colona* v. *Parksley Nat. Bank*, 120 Va. 812, 92 S. E. 979.

[10] Code section 5682 designates the means whereby a person secondarily liable upon negotiable paper may be discharged. Clause 6 is the pertinent clause of that section. It provides that those secondarily liable, as were these endorsers on this instrument (that is, the collateral note), are discharged "by any agreement binding upon the holder to extend the time of payment or to postpone the holder's right to enforce the instrument unless made with the assent of the party secondarily liable, or unless the right of recourse against such party is expressly reserved." The contention is, by construction, so to extend that clause as to release these endorsers upon this collateral note because of the extension of time on another instrument to which they were not parties. It cannot be so extended, (a) because the section clearly refers only to and specifies the identical instrument upon which the endorser is liable; and (b) because under clause 6 of the section the right of recourse even against such parties to the instrument may be expressly reserved, notwithstanding the extension of time to the maker. In this case it cannot be doubted that the bank intended expressly to reserve its right of recourse against the endorsers of this collateral note, because it continued to hold it as security and the principal note which was renewed specifically referred to each of these endorsers by name as responsible upon this

particular collateral note for the debt. No other language could more clearly express this intention to hold these endorsers of the collateral note responsible for the debt than that used in the principal note.

Upon this point the recent case of *Federal Trust Co. v. Central Trust Co.*, 244 Mass. 204, 138 N. E. 563, is illuminating. The America Ammonia Company as maker, gave to a holder in due course a note for $3,400, dated May 5, 1921, endorsed by Hittinger. There was a credit of $300 before maturity. The endorser died June 29, before maturity. On July 5, the note was protested and on the same date the holder received a note from the maker for $3,100, due in sixty days, which was several times renewed. This July 5 note and all of the renewals stated that the collateral given with it was "the note of the American Ammonia Company for $3,400, dated May 5, 1921, with endorsements." It is found as a fact that the holder did not intend to give up its rights against the deceased endorser. It was there held, construing the corresponding section of the negotiable instruments law, that this was sufficient to preserve the right of recourse against the decedent endorser, and that the plaintiff's "right against the endorser was not lost by the acceptance of the renewal notes with the original note pledged as collateral therefor."

[11] Assuming that the rights and liabilities of the endorser of the collateral note are determined by the negotiable instruments law, and we know of no way by which this conclusion can be escaped, the statute is exclusive and conclusive. There appears to be no other way to discharge an endorser who is secondarily liable upon a negotiable instrument to a *bona fide* holder thereof for value, except in one of those ways specified in the act. Code section 5682. That this

is the general view is well indicated in Vanderford v. Farmers & M. National Bank, 105 Md. 164, 66 Atl. 47, 10 L. R. A. (N. S.) 129, note; Cellers v. Meachem, 49 Ore. 186, 89 Pac. 426, 10 L. R. A. (N. S.) 133; Richards v. Bank, 81 Ohio St. 348, 90 N. E. 1000, 26 L. R. A. (N. S.) 99; Night & Day Bank v. Rosenbaum, 191 Mo. App. 559, 177 S. W. 693.

The collateral note here involved is an unqualified promise to pay $20,000. When the endorsers signed it and entrusted it to Alfred Friend, it became, as has been said, "a courier without luggage," and he was free to negotiate it. He has, in fact, however, made of it only the use which he was expressly authorized to make. He has pledged it as a continuing security to pay the indebtedness of his corporation to the bank. All that the judgment of the court requires of the endorsers is that they shall perform their contract.]

Two cases have recently been before this court involving the liability of those who pledge personal bonds as collateral security. They are, National Bank of Suffolk v. Farmers Bank of Franklin, 139 Va. 227, 123 S. E. 522 and Cobb v. Vaughan & Co., 141 Va. 100, 126 S. E. 77. Much that was said in those cases might be repeated here, but we think it only necessary to cite them as illustrating the views of this court upon the general question involved. To release either of these endorsers would be both to allow a repudiation of their contract without justification or excuse and to ignore that section of the statute which so clearly permits the holder to grant an extension to the maker and at the same time preserve his right of action against the endorser.

The chief contest, as has been stated, is made by Dunnington's executrix. The attitude of Ferrell is most unusual, for the ethical views of few rise any

higher than the law. What is authorized by law, the conscience generally allows. While Mr. Ferrell is prosecuting a writ of error to the judgment because he says that he is unwilling to pay more than one-half of it, this is his view of the controversy, for he said in his testimony:

"Here is the way I viewed it, gentlemen: That Mr. Dunnington's estate was solvent, and that I was solvent; that Mr. Friend and that Mr. Patterson's estate were not. We all, the four of us, endorsed that note with the understanding that our liability would be divided by four if we were all able to pay. If there were three able to pay, then it would be divided by three; and, if there were two able to pay, then it would be divided by two; if there was one, and I was that one, then that I would pay it all. That is the way I endorsed that note, and all other notes that I have endorsed with him or anybody else; and I recognize the fact, in making the statement that I do here now, that the estate of Mr. Patterson is insolvent and that Mr. Friend cannot pay, and that the Dunnington estate and I ought to pay. That is what I want to make clear."

While Mr. Ferrell's views cannot affect Dunnington's liability, they are highly creditable and worthy to be permanently recorded.

Our conclusion is that the judgment of the trial court is right, and as in our opinion there could have been no other proper verdict than the one rendered, it is unnecessary to discuss either the instructions which were granted or those which were refused.

*Affirmed.*