HOWARD NATIONAL BANK & TRUST COMPANY *v.* ABE NEWMAN.

(50 A2d 896)

November Term, 1946.

Present: MOULTON, C. J., SHERBURNE, BUTTLES, STURTEVANT and
JEFFORDS, JJ.

Opinion filed January 7, 1947.

*Charles F. Black* and *J. H. Macomber, Jr.,* for the plaintiff.

*Joseph S. Wool* and *A. Pearley Feen* for the defendant.

JEFFORDS, J. In July, 1942, the defendant came to the plaintiff, hereinafter called the Bank, to request the Bank to make a loan to Harley Fay of Rochester. It appeared that Fay owed Newman about $1,000.00 and wished to purchase certain chattels. The purpose of the loan was to take care of Fay's debt to Newman and provide funds for the purchase of the chattels.

After certain steps had been taken the loan was made and a note given the Bank by Fay. The note was secured by a mortgage on certain real estate owned by Fay, by a chattel mortgage on cattle owned by him, by an endorsement of Newman and an assignment of milk checks by Fay.

Shortly after the loan came due Fay became delinquent in his payments on the note and the Bank notified Newman of this default. The Bank suggested to Newman that the chattel mortgage be foreclosed. Newman agreed to this and a foreclosure was had, the net amount realized being credited on the note.

Some time later an official of the Bank called Newman on the telephone and made a demand for the balance due on the note. Newman requested the Bank to foreclose the real estate mortgage so that he could get a deficiency judgment against Fay. The bank official told Newman that a judgment against Fay would be of no value because Fay had stated that he would go through bankruptcy if suit were brought against him. Newman was asked if he would permit the Bank to take a quit-claim deed from Fay by releasing him in order that the real estate might be sold and the amount realized applied on the note. Newman asked for time to think it over.

A short time later the same official again called Newman. At first Newman objected to the taking of the deed. It was again explained to him that a deficiency judgment would be of no value because Fay had nothing and would go through bankruptcy if sued. Newman then consented to the taking of a quit-claim deed "with the understanding it would release Fay from liability".

Newman at that time said he could sell the farm for enough to pay the balance on the note.

An agent for the Bank procured the quit-claim deed from Fay with a release to Fay from any further liability on the note. Newman tried himself and through a real estate dealer to sell the farm but without success. The Bank finally sold the real estate and credited the purchase price on the note and then brought this suit for the balance due.

Before suit was brought the Bank made several demands on Newman for payment. One of his answers was that "he would pay the note" but could not do so at that time. At another time he said "it was not convenient for him to pay the ·balance right then but that he thought he had a prospect for the place and would like a little time". He asked for further time.

At the close of all of the evidence the defendant moved for a directed verdict on the grounds, in substance, that the maker of the note having been discharged by the Bank, the defendant being secondarily liable on the note was thereby discharged; that on the undisputed evidence the Bank released the principal debtor on the note without expressly reserving the right of recourse against the defendant thus releasing the latter from any liability on the note and that as to· any claim of a new promise after the release, the same is not supported by any legal consideration. The motion was granted with exceptions to the plaintiff.

By P. L. § 7260 (§ 120 of the Uniform Negotiable Instruments Act, hereinafter called the Act), it is provided that "a person secondarily liable on the instrument is discharged:

> III "By the discharge of a prior party;
> V By a release of the principal debtor, unless the holder's right of recourse against the party secondarily liable is expressly reserved."

It should be noted at the outset that while the defendant in support of the ruling below relies on both of the above sections, each of the parties in oral argument and in their briefs discuss only sub section V.

The plaintiff advances three reasons for saying that the defendant was not discharged under sub section V in this case; one being that here was an express consent by Newman to the release

of the principal debtor and that such consent is equivalent to an express reservation of the right of recourse. In support of this contention it relies on *Nat. Bank of La Cross* v. *Funke,* 215 Wis 546, 255 NW 147, 93 ALR 365, and *First National Bank of Hanover* v. *Delone,* 254 Pa 409, 98 A 1042.

The latter case had to do with sub section VI of P. L. 7260 which sets forth one of the grounds for the discharge of a person secondarily liable as follows:

> "By an agreement binding upon the holder to extend the time of payment, or to postpone the holder's right to enforce the instrument, unless made with the assent of the party secondarily liable, or unless the right of recourse against such party is expressly reserved."

In the Delone case it was held that there was evidence to prove an express reservation of a right of recourse from certain uncontradicted testimony. It is stated in the course of the opinion "that courts should not be overly particular as to the precise phraseology of such a reservation, so long as it may reasonably be construed as complying with the requirements of the act, which merely announce a well established rule."

In the Funke case the holder of notes signed an agreement of composition with the creditors of the principal debtor liable on notes which were indorsed by the defendants. It was held that the composition agreement released the debtor and the indorsers who, it might appear, had impliedly consented to the release of the debtor by signing the agreement. The basis for the holding appears in the following paragraph in the opinion:

> "Upon the language of subdivision (5) itself and in view of the insertion of assent as exempting from discharge in subdivision (6), and its noninsertion in subdivision (5) we consider that it must be held that subdivision (5) covers the instant situation and that the defendants are discharged because the bank did not expressly reserve recourse against them when it signed the composition agreement."

The court in the course of the opinion refers to *Phenix Nat. Bank* v. *Hanlon,* 183 Mo App 243, 166 SW 830, and the charac-

terization of its result as regrettable in Brannon's Negotiable Instrument Law. In the Phenix case it was held that an indorser who had written on the note in question his consent to the release of the maker was discharged from liability on the ground that the consent was not an express reservation of the right of recourse required by sub section V. In discussing the Phenix case and what is said in regard to the result in Brannon the court in the Funke case says:

> "It would seem that a holder of a note might as effectively 'expressly reserve' his right of recourse by procuring an indorser expressly to consent to the principal obligor's release as by any other method, and that the 'regrettable result' of the decision of the case last cited might have been avoided upon this ground".

This statement in the opinion is the basis for the present plaintiff's reliance on the case.

Assuming but not deciding that Newman expressly consented to the release of Fay, we do not believe that such consent can reasonably be construed as complying with the requirements of sub section V. At the common law there is a well recognized distinction between a release of a maker by the holder of a note where the holder's rights against an indorser are expressly reserved and a release consented to by the indorser. In the former case the maker is still liable to the indorser for whatever sum the latter may be called upon to pay to make up the amount remaining due. But if the indorser consented to the release he was barred of any right of recourse. *Arlington Nat. Bank* v. *Bennett,* 214 Mass 532, 101 NE 982. See also *Morse* v. *Huntington,* 40 Vt 488, 494 et seq. It is to be presumed that the framers of the Act had this distinction in mind when they drafted sub section V. It should reasonably follow, in view of this distinction, that they did not intend that consent to a release whether express or implied should be equivalent to an express reservation of rights.

In the Funke case, *supra,* it is held that the common law rule that consent by the surety to the release of the principal leaves the surety bound has been modified by the Act. It would seem to be inconsistent to hold that an indorser is not bound under sub sec-

tion V if he impliedly consents to the release but is bound if he expressly consents thereto.

Moreover, the language of sub section V is entirely inappropriate to describe a consent on the part of the indorser. It is apparent that this section applies only to agreements between the holder of a note and the maker to which the indorser is not a party for his consent is not needed and not to that class of cases, under the common law, in which he must be made a party for his consent. *Arlington Nat. Bank* v. *Bennett, supra.*

Finally, the statement in the Funke case relied upon by the present plaintiff was dictum. We are in accord with the basis for the holding in that case heretofore quoted in so far as it applies to sub section V and believe that it should apply to express as well as to implied consents to a release of a principal debtor by an indorser.

■ We hold that the consent of the defendant, whether it be considered as express or implied, to the release of the principal debtor was not equivalent to an express reservation of rights within the meaning of P. L. 7260, sub section V and consequently his consent did not under this sub section continue his liability on the note. *Nat. Bank* v. *Funke, supra; Phenix Nat. Bank* v. *Hanlon, supra.* (For the entire criticism of this latter case see Brannon's Negotiable Instrument Law, 6th ed p. 995.) See also *Diamond Nat. Bank* v. *Peck,* 13 Pa D & C 632 and *Newman* v. *Ryman,* La App, 181 So 216, a case having to do with sub section III of P. L. 7260.

The other grounds relied on by the plaintiff in support of its contention that the defendant is liable on his indorsement are based mainly, if not wholly, on the holdings and statements in *Arlington Nat. Bank* v. *Bennett, et al, supra.* In this case there was evidence tending to show that the defendants who were indorsers on a note requested the plaintiff, holder of the note, to accept a settlement with the maker releasing the latter and to apply the amount received in partial payment of the note. There was a judgment in the lower court for the plaintiff with exceptions to the defendants which were overruled on appeal. In the course of the opinion common law rules are recited to the effect that the release by a holder of negotiable paper of the maker releases the indorser unless the latter consents to the release or unless the hold-

er's rights are expressly reserved in the instrument. Sub section V is discussed and it is said that it is apparent from its wording that it does not apply to consent cases but only to those involving reservation of rights. The opinion continues as follows: "The statute speaks of an express reservation in the instrument. The language is entirely inappropriate to describe a consent on the part of the indorser, when the release is given at his request, under the second class of cases. The statute therefore should be construed as not intended to preclude the indorser and the holder from entering into an agreement by which the indorser's liability should continue unimpaired." The concluding language of the opinion is to the effect that the defendants' liability depended on their assent to the acceptance of the compromise with the principal debtor and release of the maker.

The plaintiff says, in substance, that the above case is authority for a holding that consent by an indorser is a casus omissus making applicable P. L. § 7331 (§ 196 of the Act) which provides that, "In any case not provided for in this chapter the rules of law and equity including the law merchant shall govern." It also claims that the case is authority for holding that an agreement supported by a consideration between the holder and the indorser whereby the latter agrees to remain liable after release of the maker is binding notwithstanding the provisions of P. L. 7260.

It is true that in many cases and in the text books statements may be found indicating that under the common law mere consent by an indorser to a release of the maker retains the liability of the former. Such a statement appears in the Arlington Bank case and in some of our own cases. See *Morse* v. *Huntington,* 40 Vt 488, 494, and *Smith* v. *Day,* 23 Vt 656, 662. If we assume this to be the common law rule we are of the opinion that it has been changed or modified by the Act so that it does not apply to cases coming within sub section III and V of P. L. 7260 and consequently cannot be construed as a casus omissus therefrom. The cases cited in support of our previous holding to the effect that consent to a release is not equivalent to an express reservation of rights are full authority for our present holding. See also 8 Am Jur pages 454, 455, § 806. We rely particularly on the fact that in sub section VI of P. L. 7260 consent by a party secondarily liable to an extension of time will prevent his dis-

charge while there is no corresponding phrase in sub section V. See the Funk case on this point. If it can be said that the Arlington Bank case is contrary to this holding, it is sufficient to say that we are not inclined to follow it.

Although from some statements appearing in the Arlington Bank opinion it might be claimed that the case was disposed of on the theory that mere consent by an indorser retained his liability because the common law rule had not been changed by sub section V, we do not believe that this is the necessary construction to be given to that case. Taking the opinion as a whole, and the facts and circumstances upon which it is based, it seems to us that a reasonable construction to be given the opinion is that it is based on the proposition that there was evidence to show that the indorsers had entered into an agreement with the holder for a consideration satisfactory to them to remain liable after the release was given. Apparently this is the interpretation given the case by the editors of American Jurisprudence for it is said in 8 Am Jur at page 455 in discussing sub section V that, "It seems clear that the statute should not be construed as intended to preclude the indorser and the holder from entering into an agreement by which the indorser's liability should continue unimpaired." The authority for this statement is given as "Annotation 93 ALR 369" and it appears without question that among the cases in the annotation the Arlington Bank case is the one used as the basis for the above statement in American Jurisprudence.

Although, as before noted, from statements in the Arlington Bank case in respect to consent of an indorser it might appear that mere consent on his part to the release continued his liability under the common law it is significant that the only two cases from that jurisdiction bearing on this point and cited in its support are *Gloucester Bank* v. *Worcester,* 10 Pick 528 and *Reed* v. *Tarbell,* 4 Met. 93. In each of these cases it was recognized that both consideration for the indorser's agreement to remain liable and his intention to so remain must appear in order for his liability to continue after a release of the maker. In both of these cases *Bruen* v. *Marquand,* 17 Johns. 58, is relied upon. In this latter case it is clear it was considered that in order for the indorser to continue liable after a release it must appear that he intended by his consent to remain liable.

In the Arlington Bank case it is clear from the facts that the indorsers intended to remain liable on the note and there was apparently consideration for their promise. Their liability would be reduced by the application of the amount received in settlement on the note and their request for the acceptance of the settlement and the giving of the release was granted. Thus a valid binding contract to remain liable appears to have been established. It seems reasonable to conclude from the language in the opinion heretofore quoted that this was the basis for the decision.

■ Assuming this to be so, we follow that case and hold that a valid and binding agreement on the part of an indorser to remain liable is to be treated as a casus omissus to both sub section III and sub section V of P. L. 7260.

In further support of our holding see *Newman* v. *Ryman, supra,* where it was held that although mere consent to a release would not continue an indorser's liability under sub section III it could have been continued by an agreement between the holder and the indorser.

This brings us to the question of whether there is any reasonable evidence in the case tending to establish such an agreement. Upon the facts which we have recited, viewed, of course, favorably to the plaintiff, we think that there was.

From the statement of Newman that he could sell the farm for enough to pay the balance on the note made at the time he consented to the taking of the deed and release of Fay, together with his subsequent efforts to sell the property and his statements made after demands for payment on him to the effect that he would pay the balance when he could conveniently do so, the jury could reasonably find that he intended to remain liable after the release was given.

■ A benefit to the promisor or a detriment to the promisee is sufficient consideration for a contract and the former is as good a consideration as the latter. *Jewett* v. *Smardon,* 101 Vt 488, 491, 144 A 683, and cases cited. The consideration necessary to support the kind of a contract now under consideration is referred to in *Reed* v. *Tarbell, supra,* as a consideration satisfactory to the indorser. We are of the opinion that there was evidence in the case from which the jury could reasonably find that the defendant received benefit for a promise to remain liable, if such a promise

they find in fact was made. Among the benefits would be the avoidance of bankruptcy by Fay and the resulting liability to pay the total balance due on the note by obtaining the opportunity to sell the farm for enough to satisfy such balance or, in any event, to reduce the same. The defendant would also gain time before being obliged to pay by adopting the procedure asked for by the plaintiff.

From what we have said it is apparent that the lower court should have submitted to the jury by appropriate instructions the question of whether the defendant by his consent to the release of Fay and the taking of the deed to the farm made a binding contract with the plaintiff to remain liable on the note and that the direction of a verdict for the defendant constituted reversible error.

We are aware that some courts in construing P. L. § 7259 and 7260 (§§ 119 and 120 of the Act) have held in respect, at least, to the discharge of a negotiable instrument or of a person secondarily liable on the same that the methods set forth in the Act are exclusive of all others. See *Cellers* v. *Meachem,* 49 Or 186, 89 P 426, 13 Ann Cas 997, 10 LRANS 133, and *Dunnington* v. *Bank,* 144 Va 36, 131 SE 221; Contra, *Industrial Trust Co.* v. *Goldman,* RI, 133 A 852, 112 ALR 1313. However, P. L. 7331 must be given some force and meaning. It appears to us to be impossible to conceive of a case more entitled to come under it than one of the kind here presented.

Assuming that a valid contract is found, it amounts to a waiver of the statutory rights of the parties thereto and is binding on them, no question of public policy being involved. 67 CJ 307, note 22. Consequently whether we base our holding on the ground of a casus omissus or of waiver by contract the result is the same.

The plaintiff contends that even though it be assumed the defendant was discharged from liability as a result of the release of Fay, there is evidence for the jury that his liability was subsequently revived by his acknowledgements and promises to pay. Inasmuch as the case must be reversed and sent back for a new trial it is necessary to consider this contention.

In support of its claim the plaintiff cites several cases holding that when a surety who has been discharged by extension of time to the principal promises to pay the debt, with full knowledge of the facts, he will be bound without any new consideration for his

promise. But these cases are not here in point. They illustrate an exception under the common law to the rule that a promise to render a performance from which the promisor has been discharged is not binding unless there be a consideration for the new promise. Williston on Contracts, rev. ed. § 1223.

In the present case it is assumed for the purpose of discussion of this point that the defendant had been voluntarily and unconditionally released before he made his new promise. This being so, the new promise would not merely revive the liability under the old contract but would create a new contract under which the liability would be changed from secondary to primary. In such cases it is clear that a new consideration is necessary. *Hale* v. *Rice,* 124 Mass 292; *Shepard* v. *Rhodes,* 7 RI 470, 84 Am Dec 573; Ann. 17 ALR 1335 and cases cited; 12 Am Jur 597; Williston, § 203. A debt discharged by the voluntary act of the creditor does not leave a moral obligation which is a sufficient consideration for a new promise. *Hale* v. *Rice, supra.* There being no moral obligation involved, the new promise would at most be based on a past consideration which is not sufficient to render it binding on the promisor. *Farmers and Mechanics* v. *Flint,* 17 Vt 508, 510, 44 Am Dec 351; *Barlow* v. *Smith,* 4 Vt 139, 144.

*Judgment reversed and cause remanded.*